United States District Court
Southern District of Texas
**ENTERED**
January 13, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| NORTH AMERICAN BUTTERFLY ASSOCIATION DBA NATIONAL BUTTERFLY CENTER, *et al.*, | § § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. 7:19-CV-00411 |
| NEUHAUS & SONS, LLC, *et al.*, | § § | |
| Defendants. | § § | |

## <u>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO REMAND</u>

Now before the Court is the Plaintiffs' Opposed Motion to Remand filed by Plaintiffs North American Butterfly Association d/b/a The National Butterfly Center ("NABA") and Marianna Trevino Wright ("Wright") (collectively "Plaintiffs") (Dkt. No. 26). Plaintiffs seek to remand this action to the 398th[1] Judicial District Court in Hidalgo County, Texas, ("State Court") from where it was removed. *See* (Dkt. No. 26); (Dkt. No. 1, Ex. D). After considering Plaintiffs' Motion, the parties' responsive briefings (Dkt. Nos. 38, 39, 87), and the relevant law, the Court issues the following order.

### I.      Factual and Procedural Background

Plaintiffs filed their Original Petition and Application for Injunctive Relief on December 3, 2019, in the State Court. (Dkt. No. 1, Exh. B). Defendant Neuhaus & Sons, LLC ("Neuhaus"), removed the case to this Court on December 13, 2019. *Id.* On the same day, Plaintiffs had filed their First Amended Petition and Application for Injunctive Relief ("First Amended Petition") in

---

[1] The Court notes that Plaintiffs state that the action was removed from the 389th District Court. *See* (Dkt. No. 26 at p. 1). However, the Court understands this to be a scrivener's error as Plaintiffs, in their Third Amended Complaint, represent that the action was removed from the 398th District Court. *See* (Dkt. No. 55 at ¶ 8). Additionally, the state court Register of Actions reflects that the case was originally filed in the 398th District Court. *See* (Dkt. No. 1, Ex. D).

the State Court prior to removal, but Neuhaus was unable to file the First Amended Petition in federal court. (Dkt. No. 1, Ex. B at p. 19). Neuhaus subsequently filed the First Amended Petition, the live pleading at the time of removal, on December 20, 2019.[2] (Dkt. No. 9, Exh. B) (hereinafter "First Amended Petition"). Under the First Amended Petition, Plaintiffs brought this action against Defendants Neuhaus, Brian Kolfage ("Kolfage"), We Build the Wall, Inc. ("WBTW"), Fisher Sand and Gravel Co. ("Fisher Sand"), and Fisher Industries. *Id.* at ¶¶ 4-8.

Plaintiffs allege that Kolfage is WBTW's founder and president. *Id.* at ¶ 14. Plaintiffs allege that Kolfage and WBTW are "the fundraising arms and agents" of Fisher Sand and Fisher Industries. *Id.* Plaintiffs allege that Defendants Kolfage, WBTW, Fisher Sand, and Fisher Industries (collectively "Builder Defendants") have purchased and/or obtained permission from Neuhaus to build a bollard fence ("Bollard Structure") on Neuhaus's property. *Id.* at ¶ 13. Plaintiffs assert that the Builder Defendants' practices "would result in an illegal structure that will cause permanent damages to neighboring American property belonging to [NABA]." *Id.* at ¶ 17. Specifically, Plaintiffs claim that the construction of the Bollard Structure "would cause a redirection and buildup of surface water during flooding events."[3] *Id.*

Plaintiffs allege Fisher Industries received a request from the United States Section of the International Boundary and Water Commission ("USIBWC") to cease construction of the Bollard Structure on November 15, 2019. *Id.* at ¶ 19. The request allegedly directed Builder Defendants to file permits and permit applications with the International Boundary and Water Commission ("IBWC") and give IBWC time to review the plans. *Id.* The United States filed a Complaint for Injunction Relief at the request of the USIBWC against WBTW, Fisher Industries, Fisher Sand, and Neuhaus in Case No. 7:19-cv-403 ("IBWC Case") on December 5, 2019.

---

[2] The Court "consider[s] the claims in the state court petition as they existed at the time of removal." *Id.*
[3] Although not relevant to whether removal was proper, the Court notes that Plaintiffs allege the Bollard Structure was completed in March of 2020 in the Third Amended Complaint. (Dkt. No. 55 at ¶ 18).

Plaintiffs also allege that Defendants Kolfage and WBTW "published defamatory statements through their Twitter accounts in November 2019," claiming that Plaintiffs "are engaged in 'human trafficking' and 'drug smuggling[.]'" *Id.* at ¶ 15. Plaintiffs assert that these representations are "malicious and false attacks on Plaintiffs." *Id.* Plaintiffs allege that Kolfage and WBTW made these defamatory statements while acting as agents to Fisher Sand, Fisher Industries, and Neuhaus. *Id.* at ¶ 25. Plaintiffs also allege that Defendants conspired to defame Plaintiffs. *Id.*

Plaintiffs bring several causes of action against Defendants. First, NABA brings a nuisance claim against Defendants because the Bollard Structure "will result in a condition that will substantially interfere with [NABA's] private use and enjoyment of its land. *Id.* at ¶ 22. NABA seeks damages "for any injury to its property that may occur by the date of trial" and injunctive relief for its nuisance claim. *Id.* at ¶ 23. Second, NABA claims that the construction of the Bollard Structure or the Bollard Structure itself will violate Texas Water Code § 11.086(a) since it will cause an overflow of water, "which will result in an unlawful diversion or impounding of water."[4] *Id.* at ¶ 24. NABA also seeks damages and equitable relief pursuant to Texas Water Code § 11.086(b) for this cause of action. *Id.* Last, Plaintiffs claim Defendants are liable for defamation and business disparagement. *Id.* at ¶ 25. Plaintiffs seek damages for their defamation and business disparagement claim. *Id.* at ¶ 27.

The Court held a hearing on Plaintiff's request for a temporary restraining order on January 3, 2020, which was continued to January 9, 2020.[5] At the conclusion of the January 9,

---

[4] NABA dropped its claim for a violation of the Texas Water Code in its live pleading. (Dkt. No. 55).

[5] This hearing was combined with the Preliminary Injunction Hearing in the IBWC Case. Prior to these hearings, on December 5, 2019, after holding a hearing on the matter, the Court issued a Temporary Restraining Order in the IBWC Case. *See* (Case No. 7:19-cv-403, Dkt. No. 7). On December 18, 2019, the Court entered an Agreed Amended Temporary Restraining Order in the IBWC Case in accordance with the agreement of the parties in that case. *See id.*, Dkt. No. 23. The Court ordered, orally at the January 3, 2020 hearing, that the Agreed Amended Temporary Restraining Order, with one change, be extended until January 9, 2020, at which time it expired.

2020 hearing, the Court denied without prejudice Plaintiffs' request for a temporary restraining order.

Plaintiffs filed their Motion to Remand on January 10, 2020. (Dkt. No. 26). Plaintiffs noted that Defendants relied on NABA's nuisance claim for federal question jurisdiction and argues that the claim does not involve a federal question. *Id.* at p. 2. In response, all Defendants except for Kolfage[6] argue the Court has federal question jurisdiction over this lawsuit.

## II.   Legal Standard

A party may remove a case from a state court to a federal court if the federal court has original jurisdiction. 28 U.S.C. § 1441(a). The party removing a case to federal court has the burden to show "that federal jurisdiction exists and that removal was proper." *Manguno v. Prudential Prop. & Cas. Ins. Co*., 276 F.3d 720, 723 (5th Cir. 2002). "Any ambiguities are construed against removal because the removal statute should be strictly construed in favor of remand." *Id.*

A federal district court has original, federal question jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "The plaintiff is the master of [its] complaint, and, as such, a determination that a cause of action presents a federal question depends upon the allegations of the plaintiff's well-pleaded complaint." *Roland v. Green*, 675 F.3d 503, 520 (5th Cir. 2012) (quoting *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 680 (5th Cir. 2001)) (internal quotations omitted), *aff'd sub nom. Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014). The well-pleaded complaint rule marks the boundaries of federal question jurisdiction. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987).

In certain circumstances, the Court may look at record evidence to determine jurisdictional facts. *See, e.g. Coury v. Prot*, 85 F.3d 244, 249 (5th Cir. 1996) ("In making a jurisdictional

---

[6] The Court notes that Defendant Brian Kolfage likely did not respond to Plaintiffs' Motion to Remand since he has not yet been served. *See* (Dkt. Nos. 46–47).

assessment, a federal court is not limited to the pleadings; it may look to any record evidence, and may receive affidavits, deposition testimony or live testimony concerning the facts underlying the citizenship of the parties.").  However, the jurisdictional facts that support removal must be judged at the time of the removal, and any post-petition affidavits are allowable only if relevant to that period of time." *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1335 (5th Cir. 1995) (analyzing whether the amount-in-controversy requirement for diversity jurisdiction as satisfied); *Gebbia v. Wal-Mart Stores, Inc.*, 233 F.3d 880, 883 (5th Cir. 2000) (same).  It is a long-standing general rule in the Fifth Circuit "that jurisdictional facts are determined at the time of removal, and consequently post-removal events do not affect that properly established jurisdiction." *Louisiana v. American Nat. Property Cas. Co.*, 746 F.3d 633, 636 (5th Cir. 2014).  Amended complaints made after removal are not considered in determining the right to remove.  *See Pullman Co. v. Jenkins*, 305 U.S. 534, 537 (1939) ("The second amended complaint should not have been considered in determining the right to remove, which in a case like the present one was to be determined according to the plaintiffs' pleading at the time of the petition for removal.").

## III.   Analysis

Plaintiffs argue that Neuhaus failed to explain how the Grable Doctrine was implicated in the Notice of Removal.  (Dkt. No. 26 at § II).  Defendants argue this Court has § 1331 federal question jurisdiction through treaties, complete preemption, the Grable Doctrine, and federal enclave jurisdiction.[7]  For the following reasons, the Court finds that it has jurisdiction over the nuisance and Texas Water Code claims, but it does not have jurisdiction over the defamation and business disparagement claims.

## A.   Federal Regulatory Background

---

[7] There is no diversity jurisdiction since Plaintiffs and Neuhaus are citizens of Texas.  *See* 28 U.S.C. § 1332(a).

As Defendants' arguments relate to specific treaties of the United States and their regulatory framework, the Court provides a basic background at the outset.  The USIBWC is "a federal government agency and the U.S. component of the [IBWC], which applies the boundary and water treaties of the United States and Mexico and settles differences that may arise in their application."  INTERNATIONAL BOUNDARY & WATER COMMISSION, UNITED STATES AND MEXICO, UNITED STATES SECTION, https://ibwc.gov/home.html (last visited January 4, 2022).  The IBWC was initially established as the International Boundary Commission in 1889.  *Id.* at https://ibwc.gov/About_Us/About_Us.html (last visited January 4, 2022).

In 1944, the United States and Mexico entered a treaty "relating to the utilization of the waters of the Colorado and Tijuana Rivers, and of the Rio Grande (Rio Bravo) from Fort Quitman, Texas, to the Gulf of Mexico . . .." Treaty for the Utilization of Waters of the Colorado and Tijuana Rivers and of the Rio Grande, Mex.-U.S., Proclamation, Feb. 3, 1944, 59 Stat. 1219 (hereinafter "1944 Treaty").  Under the 1944 Treaty, the IBWC is tasked with studying, investigating, and preparing plans for flood control works.  *Id.* at Art. 6.  The United States and Mexico agreed to acquire private property required for the execution and performance of the 1944 Treaty.  *Id.* at Art. 23.  Each country, through their section of the IBWC, agreed to retain "direct ownership, control, and jurisdiction within its own territory and in accordance with its own laws, over all real property . . . that it may be necessary to enter upon and occupy for the construction, operation or maintenance of all the works constructed, acquired or used pursuant to this Treaty.  *Id.*  The USIBWC has "to the extent necessary to give effect to the provisions of this Treaty, jurisdiction over the works constructed exclusively in the territory of its country whenever such works shall be connected with or shall directly affect the execution of the provisions of this Treaty."  *Id.* at Art. 24(b).

In 1970, the United States and Mexico entered a subsequent treaty.  Treaty to Resolve Pending Boundary Differences and Maintain the Rio Grande and Colorado River as the International Boundary, Nov. 23, 1970, 23 U.S.T. 371 (hereinafter "1970 Treaty").  Under the 1970 Treaty, "[e]ach contracting state . . . may protect its bank against erosion and . . . may construct works in the channel or channels that are completely within its territory in order to preserve the character of the limitrophe channel . . . ."  *Id.* at Art IV(A)  Additionally, "each Contracting State shall prohibit the construction of works in its territory which, in the judgment of the [IBWC], may cause deflection or obstruction of the normal flow of the river or of its flood flows."  *Id.* at Art. IV(B)(1).  In connection with the 1970 Treaty, "the Secretary of State, acting through the United States Commissioner, International Boundary and Water Commission, United States, and Mexico [("USIBWC Commissioner")], is authorized" to conduct investigations, acquire lands, and "to remove, modify, or repair damages caused to Mexico" by projected constructed in the United States.  22 U.S.C. § 277d-34.

## B.     Grable Doctrine

Defendants argue this Court has federal question jurisdiction under the Grable Doctrine. Federal question jurisdiction is invoked if plaintiffs plead a cause of action created by federal law or if there are state-law claims "that implicate significant federal issues."  *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005).  When federal question jurisdiction depends on state-law claims, "the question is, does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Grable*, 545 U.S. at 314.  "That is, federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by

Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013); *Bd. of Comm'rs of Se. La. Flood Prot. Auth.—E. v. Tennessee Gas Pipeline Co., L.L.C.*, 850 F.3d 714, 721-22 (5th Cir. 2017) (hereinafter "*Tenn. Gas*"); *Singh v. Duane Morris LLP*, 538 F.3d 334, 338 (5th Cir. 2008). "[A] case arises under federal law where 'the vindication of a right under state law necessarily turn[s] on some construction of federal law[.]'" *Tenn. Gas*, 850 F.3d at 723 (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 9 (1983)).

**i.    Necessarily Raised**

For the first prong of the Grable Doctrine, Defendants argue that a federal issue was necessarily raised because "Plaintiffs' claims relating to the construction on the banks of the Rio Grande River require application of federal law and a treaty between the United States and Mexico." (Dkt. No. 38 at ⁋ 25). Defendants support this assertion by drawing a parallel between this case and the IBWC Case. *Id.* at ⁋⁋ 22-25. Defendants state that in the IBWC Case "the USA claimed sole authority to regulate the United States Boundary and flood plain on the Rio Grande, and more specifically the activities of these Defendants to build a border fence on the flood plain of the Rio Grande River." *Id.* at ⁋ 24. According to Defendants, a federal issue is necessarily raised by the First Amended Petition because both this case and the IBWC Case raise "the same issues related to the same border fence" and both seek injunctive relief. *Id.*

The Fifth Circuit has previously found a district court to have jurisdiction over a nuisance claim that depends on the construction of federal law. In *Tennessee Gas*, "[t]he complaint describe[d] 'a longstanding and extensive regulatory framework under both federal and state law' that protects against the effects of dredging activities and establishes legal duties by which Defendants purportedly are bound." 850 F.3d at 720. The Fifth Circuit noted that "[t]he fact that a substantial federal question is necessary to the resolution of a state-law claim is not sufficient to permit federal jurisdiction." *Id.* at 721 (quoting *Singh*, 538 F.3d at 337-38). Still, the Fifth Circuit

found the plaintiff's "complaint draws on federal law as the *exclusive* basis for holding Defendants liable for some of their actions." *Id.* (emphasis added). Specifically, "a court would not be able to establish the magnitude of any potential liability without *construing*" the Clean Water Act of 1972 and the Rivers and Harbors Act of 1899. *Id.* at 722-23 (emphasis added). The Fifth Circuit concluded that the plaintiff's negligence and nuisance claim necessarily raised federal issues, noting that Supreme Court precedent dictates that a state-law claim arises under federal law when it claim "necessarily turn[s] on some construction of federal law." *Id.* at 723 (quoting *Franchise Tax Bd.*, 463 U.S. at 9); *see Hedrick*, 226 F.2d at 6 (noting that a case arises under the Constitution, law, or treaty of the united states whenever a correct decision depends on any of their construction).

In a way, this case is distinct from *Tennessee Gas*. NABA's nuisance claim itself does not implicate federal law "as the *exclusive* basis for holding Defendants liable for some of their actions." *Id.* at 721 (emphasis added). Under Texas law, nuisance is a legal injury, not a cause of action. *Crosstex North Texas Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 588 (Tex. 2016). To prove a nuisance, "a plaintiff must establish that the effects of the substantial interference on the plaintiff are unreasonable—not that the defendant's conduct or land use was unreasonable." *Id.* at 597. On its face, the First Amended Petition does not implicate federal law because nuisance turns on the Bollard Structure's effect on NABA's property. NABA will not need to establish that Defendants' conduct or land use was unreasonable or illegal under federal law, the 1944 Treaty, or the 1970 Treaty. Thus, NABA's nuisance claim is distinct from that in *Tennessee Gas* since federal law is not the exclusive basis for holding Defendants liable.

Still, NABA's requested relief adds a layer of complexity that invokes a federal question or interest. At the time of removal, construction of the Bollard Structure had commenced but was not complete.[8] NABA sought injunctive relief for both its nuisance and Texas Water Code

---

[8] The facts as alleged in the First Amended Petition suggest that Defendants had not yet started construction on the Bollard Structure. *See* First Amended Petition at ¶ 17 ("Builder Defendants' rush to avoid studies and inspection

violation claim to enjoin Defendants from "constructing any structure or wall on Neuhaus' property within the flood zone south of Mission, Texas."[9]  First Amended Petition at ⁋ 31.  If NABA were to prevail on its claims, then NABA would be entitled to injunctive relief.  It is likely, however, that injunctive relief would  be as broad as the relief NABA sought in the First Amended Petition.  "An injunction is an exercise of a court's equitable authority, to be ordered only after taking into account all of the circumstances that bear on the need for prospective relief." *Salazar v. Buono*, 559 U.S. 700, 714 (2010).  Based on the facts at the time of removal, injunctive relief may have allowed for the construction of a structure or wall to continue with specifications meant

---

*would* result in an illegal structure . . ..  Builder Defendants' construction of a permanent steel wall . . . *would* cause a redirection and buildup of surface water during flooding events.").  Prior to removal, however, the Court held a temporary restraining order hearing in the IBWC Case on December 5, 2019.  *See supra* note 5; (Case No. 7:19-cv-403, Dkt. No. 10) (Transcript re: Hearing Held on Dec. 5, 2019).  At this hearing, the United States, represented by Paxton Warner, Daniel Hu, and John Smith, introduced photos of the Bollard Structure reflecting that construction had already commenced.  The Government, in describing Exhibit 4, stated that the IBWC Case's defendants

> have dug a trench and they have these big CAT vehicles lined up in front of the trench with mounting posts on them.  And they're bringing in the bollards here on the truck on the right.  And by all appearances it looks like they're ready to drop bollards into the trench that I showed the court in Exhibit 1 that has been set up to hold bollard down.

(Case No. 7:19-cv-403, Dkt. No. 10 at p. 8).  Exhibit 1, a photo taken in the morning of December 5, 2019, showed steel rebar material in a trench.  *Id.* at p. 6.  The Government also indicated that the defendants in that case "made a beach phase feature on what used to be a riverbank that was at least probably three feet in height."  *Id.* at p. 7.  The defendants also had shaved about a mile of the bank of the river.  *Id.* at p. 14, 17.

The Court ultimately granted the temporary restraining order, which was subsequently amended on December 18, 2019.  (Case No. 7:19-cv-403, Dkt. Nos. 7, 23).  The Court concurrently held a preliminary injunction hearing for the IBWC Case and a temporary restraining order hearing in this case on January 3, 2020, which was continued to January 9, 2020.  (Case No. 7:19-cv-403, Dkt. No. 34) (Transcript re: Preliminary Injunction Hearing Held on Jan. 3, 2020); (Case No. 7:19-cv-403, Dkt. No. 34) (Transcript re: Ruling of Court Held on Jan. 9, 2020); (Dkt. No. 27) (Partial Transcript re: Preliminary Injunction Hearing Held on Jan. 9, 2020).

Given that the Court concurrently heard arguments regarding both this case and the IBWC case at the January 3, 2020, and January 9, 2020 hearings, the statements and exhibits from the December 5, 2019 hearing were a part of the record evidence.  Even if the statements and exhibits are not part of record evidence in this separate case, the Court may take judicial notice of its court records.  *See* Fed. R. Evid. 201(b)(2) (stating that the Court may take judicial notice of a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").  Therefore, the Court finds that at the time of removal, significant construction of the Bollard Structure had commenced but was not complete.

[9] In the current live pleading, NABA "seeks a permanent mandatory injunction directing Defendants to dismantle and remove the subject wall."  Id. at ⁋ 23.  If NABA were to prevail on its claim, an injunction partially dismantling or changing the design of the Bollard Structure would implicate the United States' obligation to maintain the international boundary under the 1944 Treaty or 1970 Treaty.  The Court, however, determines jurisdictional facts at the time of removal.

to prevent a nuisance or Texas Water Code violation.  For example, injunctive relief may have allowed Defendants to complete construction of the Bollard Structure with a specified spacing between each bollard to prevent injury to neighboring properties.

Importantly, injunctive relief based on the facts known at the time of removal must also consider the United States' interest in maintaining its boundary with Mexico.  Under the 1970 Treaty, "each Contracting State shall prohibit the construction of works in its territory which, in the judgment of the [IBWC], may cause deflection or obstruction of the normal flow of the river or of its flood flows."  1970 Treaty at Art. IV(b)(1).  As Defendants noted in their brief, "the standards by which the project is ultimately going to be approved or modified, are set by the US treaties with Mexico, as interpreted, determined, controlled, and implements by the IBWC."[10]  *Id.* at ¶ 25.  So, the Court will not be able to fully determine the scope of injunctive relief without considering the United States' interest in maintaining its boundary with Mexico, similar to how "a court would not be able to establish the magnitude of any potential liability without *construing*" federal laws in *Tennessee Gas*.  *See* 850 F.3d at 722-23 (emphasis added).

Due to the complexities of the requested relief, the question now becomes whether a federal issue regarding the scope of the requested relief satisfies the "necessarily raised" prong of the Grable Doctrine.  At least one district court has relied on a requested injunction to find a federal issue was necessarily raised under the Grable Doctrine.  In *McKay v. City and County of San Francisco*, the plaintiffs either owned or occupied land in the flight paths for airplanes landing at two airports.  No. 16-cv-03561 NC, 2016 WL 7425927, *1 (N.D. Cal. Dec. 23, 2016).  Plaintiffs requested the district court to prohibit use of the flight paths and to order reversion to older flight paths.  *Id.* at *1-*2. On the issue of whether a federal issue was necessarily raised under the Grable

---

[10] Plaintiffs argue that "[w]hether the federal government is a necessary party to, or has an interest in, this litigation is a superficial concern given the history of this case."  (Dkt. No. 87 at p. 2).  The Court simply notes at this time that the United States may have an interest if Plaintiffs were to prevail on their claims.

Doctrine, a defendant "argue[d] plaintiffs' claims are 'inescapably intertwined' with a collateral attack on an [Federal Aviation Admiration ('FAA')] order.'" *Id.* at *4. According to the court, "[a] request to enjoin the use of the flight paths after the FAA's approval is tantamount to asking the Court to second guess the validity of the FAA's decision." *Id.* The district court found that a federal issue had been necessarily raised under the Grable Doctrine since the plaintiffs' requested relief "challenges the validity of the FAA's actions and its observance of its statutory mandate.". *Id.* Even though the district court ultimately found removal to be proper under the Grable Doctrine, the court dismissed the claims since it lacked subject matter jurisdiction under 49 U.S.C. § 46110. *Id.* at *7-*8.

On the other hand, not all requests for injunction necessarily raise a federal issue. In *In re National Prescription Opiate Litigation*, the defendant removed the case to federal court after Montana filed a motion for preliminary injunction. No. 17-md-2804, 2018 WL 419413, *1-*2 (N.D. Ohio Aug. 23, 2018). Montana sought to enjoin defendant from promotional and educational activity related to opioid drugs. *Id.* at *1. The defendant argued that Montana's motion raised a federal issue since the Food and Drug Administration ("FDA") had exclusive regulatory authority to determine the content of drug labeling, comparing the case with *McKay*. *Id.* at *2-*3. The district court disagreed with the defendant's characterization because "if the court were to grant Montana's Motion for Preliminary Injunction, neither the FDA's decision-making process nor its approved labeling would be implicated." *Id.* at *3. The district court ultimately found that the defendant was not entitled to removal. *Id.*

Moreover, there may be argument that a request for injunction itself does not necessarily raise a federal issue. *See Riehm v. Wood Resources, LLC*, No. 16-12747, 2016 WL 6123372, *5 n.5 (E.D. La. Oct. 20, 2016) ("[E]ven if Plaintiffs had requested injunctive relief, this would be insufficient to 'necessarily raise' a federal issue."). The Supreme Court has stated that "[a] case

'aris[es]' under' federal law within the meaning of § 1331 . . . if 'a well-pleaded complaint establishes . . . that the plaintiff's *right to relief* necessarily depends on resolution of a substantial question of federal law.'" *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 690 (2006) (quoting *Franchise Tax Bd.*, 463 U.S. at 27-28); *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199 (1921) (stating that a state-law claim gives rise to federal question jurisdiction "where it appears from the [complaint] that the right to relief depends upon the construction or application of [federal law]").[11]  A plaintiff's right to relief does not necessarily depend on the relief requested.

Ultimately, the question under the Grable Doctrine is whether "a state-law claim necessarily raise[s] a stated federal issue." *Grable*, 545 U.S. at 314.  Under the well-pleaded complaint rule, the First Amended Petition's allegations determines whether a cause of action presents a federal question. *Roland*, 675 F.3d at 520.  Although the right to relief and the requested relief are separate questions, both are questions that are presented in the First Amended Petition. While NABA's request for injunction is not meant to second guess a federal agency's decision as in *McKay*, the requested relief still raises a federal issue that will implicate the 1970 Treaty.  As discussed, the Court will be unable to fully determine the scope of injunctive relief without considering the United States' interest in maintaining its boundary with Mexico, and any injunctive relief would require the court to at least determine USIBWC's interest in this case and compliance with the 1970 Treaty.  Therefore, the Court finds that the First Amended Petition necessarily raises a federal question with respect to the scope of the requested injunctive relief in NABA's nuisance and Texas Water Code violation claims.

## ii.    Actually Disputed

A federal issue is actually disputed if the parties disagree with respect to the proper interpretation of federal law. *See Tenn. Gas*, 850 F.3d at 723.  Plaintiffs allege that Defendants

---

[11] The Supreme Court has stated that *Smith*'s statement of the scope of what is now known as the Grable Doctrine is "generous." *Grable*, 245 U.S. at 312-13.

have failed to comply with "federal laws regarding the building of structures on the banks of the Rio Grande River."  First Amended Petition at ¶ 30.  At the time of removal, Plaintiffs sought injunctive relief to enjoin Defendants from "constructing any structure or wall on Neuhaus' property within the flood zone south of Mission, Texas."  *Id.* at ¶ 31.  In its answer to the First Amended Petition, Neuhaus denies that it failed to comply with "federal law regarding the actions it has taken in leasing the property" and "denies that Plaintiffs are entitled to the relief sought against it." (Dkt. No. 10 at ¶ 30-31).  Additionally, Defendants seemed to believe that they would be able to continue construction of the Bollard Structure when they responded to the Motion to Remand. *See* (Dkt. No. 38 at ¶ 25) ("Further the standards by which the project is ultimately going to be *approved or modified*, are set by the US Treaties with Mexico, as interpreted, determined, controlled, and implemented by the IBWC." (emphasis added)).  The Court finds that the scope of the requested injunctive relief, and specifically how federal law affects the scope, is actually disputed among the parties.

### iii.    Substantial

Next, the Court must determine whether the federal issue is substantial.  "For a federal issue to give rise to federal jurisdiction, 'it is not enough that the federal issue be significant to the particular parties in the immediate suit . . . . The substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole.'"  *Tenn. Gas*, 850 F.3d at 723 (quoting *Gunn*, 568 U.S. at 260).

The Court finds that the federal issue is important to the federal system as a whole.  The United States, at the request of the USIBWC, filed their own civil action relating to the Bollard Structure on December 5, 2019, two days after Plaintiffs filed their suit in State Court.  (Case No. 7:19-cv-403, Dkt. No. 1).  At the time of removal, the USIBWC sought relief since the Bollard Structure "may cause an obstruction or deflection of the flood and river flows of the Rio Grande

River," which would trigger the USIBWC's obligations under the 1970 Treaty.[12]  *Id.* at ¶¶ 26-29.

In the most extreme situation, injunctive relief may affect the United States' boundary with

Mexico.  But the Court does not need to rely on the most extreme situation.  Any injunctive relief

a court may grant in this case potentially triggers the USIBWC's obligations under the 1970 Treaty.

Crafting injunctive relief that prevents injury to NABA's land and maintains the USIBWC's

obligations is important to the federal system as a whole.

### iv.    Federal-state balance

The last prong of the Grable Doctrine asks whether the federal issue is "capable of

resolution in federal court without disrupting the federal-state balance approved by Congress."

*Gunn v. Minton*, 568 U.S. at 258 (2013).  This balance "would be disturbed by the exercise of

federal jurisdiction where such exercise would 'herald[] a potentially enormous shift of

traditionally state cases into federal courts.'"  *Tenn. Gas*, 850 F.3d at 725 (quoting *Grable*, 545

U.S. at 319).  "[T]he absence of threatening structural consequences" is relevant to this inquiry.

*Grable*, 545 U.S. at 319; *Tenn. Gas*, 850 F.3d at 725.

The Court does not believe exercise of federal jurisdiction would present an enormous shift

of nuisance and Texas Water Code claims to federal court because the issue here is strongly tied

to the requested relief and location of the dispute ("on the banks of the Rio Grande").  Parties do

not indicate a threat of structural consequences flowing from the exercise of federal jurisdiction.

Even if federal jurisdiction would cause a shift, "the scope and limitations of a complex federal

regulatory framework are at stake in this case, and disposition of the question whether that

framework may give rise to state law claims as an initial matter will ultimately have implications

for the federal docket one way or the other."  *Tenn. Gas*, 850 F.3d at 725.  Therefore, the Court

---

[12] As the Bollard Structure has completed construction, the United States continues to seek equitable relief to ensure the Bollard Structure is in compliance with the USIBWC's requirements and procedures.  (Case No. 7:19-cv-403, Dkt. No. 68 at ¶¶ 53-56) (Second Amended Complaint for Permanent Injunctive Relief).

finds that the exercise of federal jurisdiction would not disrupt the federal-state balance approved by Congress. Thus, this Court has federal question jurisdiction over the nuisance and Texas Water Code violation claims under the Grable Doctrine.[13]

## C.   Defamation and Business Disparagement Claims

Plaintiffs also bring defamation and business disparagement claims against all Defendants. First Amended Petition at ¶¶ 25-27. Defendants argue that this Court has supplemental jurisdiction over these claims. (Dkt. No. 38 at ¶ 37).

When a case is removed and a court finds that it has federal question jurisdiction over a claim, "the federal court may elect to exercise jurisdiction over any state-law claims in the case *only if those claims meet the requirements for supplemental jurisdiction under 28 U.S.C. § 1367(a).*" *S J Associated Pathologists, P.L.L.C. v. Cigna Healthcare of Texas, Inc.*, 964 F.3d 369, 373 (5th Cir. 2020). "[D]istrict courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367. For supplemental jurisdiction, "the question is whether the supplemental claims are so related to the original claims that they derive from a common nucleus of operative fact." *Bella v. Davis*, 531 F.App'x 457, 459 (5th Cir. 2013). If a removed civil action includes a claim that arises under federal law within the meaning of 28 U.S.C. § 1331 and a claim not within the federal district court's original or supplemental jurisdiction, "the district court shall sever from the action all claims" not within its original or supplemental jurisdiction "and shall remand the severed claims to the State court from which the action was removed." 28 U.S.C. § 1441(c)(2). In other words, when a district court does not have original or supplemental jurisdiction over state-law claims,

---

[13] Since the Court finds it has jurisdiction under the Grable Doctrine, the Court does not analyze whether it has jurisdiction through Defendants' other theories for jurisdiction.

"the district court ha[s] no discretion to retain the claims in federal court and [is] required to immediately remand them."  *S J Associated Pathologists, P.L.L.C.*, 964 F.3d at 374.

The Court found in Part III.B that it has federal question jurisdiction over the nuisance and Texas Water Code violation claims under 28 U.S.C. § 1331 due to the substantial federal issue raised by Plaintiffs' request for injunctive relief.  Those claims arise out of the potential effect the Bollard Structure will have on NABA's property. [14]  The defamation and business disparagement claims, however, arise out of Kolfage's and WBTW's alleged statements, including tweets on Twitter.  First Amended Petition at ¶¶ 15, 25, Exh. B.  The facts supporting the defamation and business disparagement claims are unrelated to whether the Defendants are liable for NABA's nuisance and Texas Water Violation claims.   In other words, the defamation and business disparagement claims do not derive from a common nucleus of operative facts as the nuisance and Texas Water Code violation claims.  Therefore, this Court does not have supplemental jurisdiction over the defamation and business disparagement claims.

## IV.    Conclusion

For the foregoing reasons, it is **ORDERED** that Plaintiffs' defamation and business disparagement claims against all Defendants are **SEVERED** from this civil action and **REMANDED** to the State Court from where this action was removed pursuant to 28 U.S.C. § 1441(c)(2).  The Court **ORDERS** that Plaintiffs' Motion to Remand (Dkt. No. 26) is **DENIED** in all other respects. This Court has jurisdiction over all other claims.

---

[14] To prove a nuisance, "a plaintiff must establish that the effects of the substantial interference on the plaintiff are unreasonable—not that the defendant's conduct or land use was unreasonable."  *Crosstex North Texas Pipeline, L.P.*, 505 S.W.3d at 597.  To prove a violation of the Texas Water Code § 11.086(a), a plaintiff must prove damage to her property.  *See Benson v. Russel's Cuthand Creek Ranch, Ltd.*, 183 F.Supp.3d 795, 808 (S.D. Tex. May 3, 2016) (quoting *Texas Woman's Univ. v. The Methodist Hosp.*, 221 S.W.3d 267, 277 (Tex. App.—Houston [1st Dist.] 2006, no pet.)) (stating the elements for a claim when a plaintiff seeks damages).

17 / 18

SO ORDERED January 13, 2022, at McAllen, Texas.

Randy Crane
United States District Judge